Good morning. Please be seated. Before we begin, I'd like to remind everybody that these microphones are for recording purposes only. They do not amplify. So not only can the people in back of you not hear what you're saying unless you raise your voice, we probably can't either. So please help us out. I'd like the clerk to call the case, please. I'm Jennifer Bontrager from the State Appellate Defender for Larry Peters. Good morning, Your Honors. My name is Mary Hodson Buehler. I'm an Assistant State's Attorney representing the people of the State of Illinois. Good morning, and may it please the Court. Again, I'm Jennifer Bontrager for Larry Peters. I plan to spend my time this morning on the second issue in the briefs, addressing the prosecutor's misconduct in eliciting and commenting upon Larry's post-arrest silence, but of course I'll answer whatever questions Your Honors have on the other issues as well. In Illinois, evidence of an accused's post-arrest silence is inadmissible for any purpose. This is a rule of Illinois evidence and it is unaltered by federal constitutional cases. The rule prohibits eliciting or presenting evidence of an accused's post-arrest silence because, as the Illinois Supreme Court has found, such evidence is neither material nor relevant to the question of guilt, but can be especially prejudicial because of its obvious potential for exploitation by the prosecution. Do we know when Mr. Peters was Mirandized? We do not know when he was Mirandized, though he was taken into cuffs. He was handcuffed immediately upon... Well, immediately after he said he had shot his brother, correct? Yes, that's correct. He was... He said that first. We know that. I'm sorry? We know he said that before he was handcuffed. He was, but I don't think he had any... I don't think anyone would feel free to leave the encounter. He was undoubtedly seized before the handcuffs went on. He was approaching the officer. The officer approached him, gunned on. He put his hands up and said, I just shot my brother. I want to turn myself in. He wasn't Mirandized at that time. No, he wasn't, and the record is unclear on whether he was Mirandized, but it doesn't matter whether he was Mirandized. Because this is a rule of Illinois evidence, whether his statements or his silence came before or after he was Mirandized is not relevant to the question. What were the questions? It seemed to me they were trying to elicit what he said and whether he said anything other than, I just shot my brother. I mean, they weren't asking about his silence. They were asking about what he had said. Did he say something else? They were trying to inquire into the extent of his statement to the police. Right, but asking if he said anything else, well, didn't you tell them this and didn't, you know, you didn't say anything else? You didn't say, or asking the officer, for example, did the defendant tell you anything like his brother had a gun? Did he say anything at all to you regarding he was acting in self-defense? Did he say I had to shoot my brother? Those questions were improper. They all sought to, they all elicited the fact that he did not say anything. Well, we don't know that. That wasn't the intent of those questions were to find out what he did say when he said something. I mean, he did say something and he said it voluntarily, correct? Absolutely, yes. So can't they inquire into what he said and whether he said anything else? I mean, the fact that we know he said that statement, that doesn't mean he didn't say something else. Well, no, because under this rule of Illinois law, he can get to, what can be asked is, you know, he approaches the police, he says, I just shot my brother, I'm turning myself in. He also answered the question about where the gun was. Under Illinois law, full stop. Because we know he did not say anything else. How do we know that? Because he exercised his right to remain silent after that point. But we don't know that. We don't know if he said something else. You're assuming that those are the only two things he said. And when the prosecutor tried to find out, was there anything else he said? The prosecutor knew, like, through all of the discoveries, through all of the reports, through all of, you know, any interrogations were recorded, the prosecutor already knows that. And eliciting that fact, that particularly prejudicial fact that is exploited to suggest that he's trying to hide something, that he's holding something back, and that he's inventing at the point of trial that he was, in fact, acting in self-defense, that's improper under Illinois law. So the prosecutor, let's say these questions weren't asked. All the prosecutor asked was, what did the defendant say? He said, I shot my brother. And in closing, isn't the prosecutor entitled to say, all he told that policeman was, I shot my brother. You didn't hear anything about, he had a gun on me. I had to shoot him. She could make those arguments, couldn't she? I disagree. That's improperly commenting on his silence after his single, after his statement. His silence after that was not admissible, and it's not, it's not an appropriate, it's not an appropriate comment in closing. So when a defendant speaks voluntarily to the police and incriminates himself, everything else is off limits? If he stops speaking and is then silent, yes, that silence is off limits. But, you know, getting in, I just shot my brother, I'm trying to turn myself in, that's enough. But no, going into his subsequent silence, his failure to explain himself to that arresting officer, that's not admissible. That's unfairly prejudicial to the defendant. And it goes right to the crux of his self-defense case by trying to, you know, trying to discredit his version of the events. It's trying to discredit his self-defense or his unreasonable self-defense defense. Well, let's assume we agree with you that there shouldn't have been a comment on this. When the evidence is that as Larry testifies, Ronald is holding a revolver on him. And he is unloading, ejecting a spent shell, putting a new shell in his shotgun. He shoots Ronald, Ronald is still holding the gun on him, not saying I'm going to kill you, not threatening him. Ejects the shell, puts a new shell in, shoots him again. How is that not harmless here? Well, I mean, I'm sorry, there was something you said factually that I wanted to disagree with, but I've lost my train on that. Okay, I'm sorry. I said he was holding the revolver, I was ejecting and reloading his shotgun. It was not, under Larry's testimony, Ronald was still yelling and cursing and swearing at him. They were, they had been, you know, locked in physical, like they fell apart. Yes, he was, but he said his objective was. The question is when his defense at trial is I was defending myself. Right. And the person he was supposedly defending himself against is allowing him to eject and reload his shotgun and shoot him again. Isn't any comment on his failure to say to the police, he was holding a gun on me, I was acting in self-defense. Isn't it harmless here or beyond a reasonable doubt? Not at all, not at all. The jury still could have believed that, the jury could have found at the very least that yes, he had that subjective and genuine belief that his brother was going to fire that revolver at him. And perhaps after that, perhaps after that shot, you know, Ronald still has the gun on him, maybe that's when it became subjectively unreasonable. But he still had that belief in the need to act in his own self-defense. It's certainly not harmless. In the context of no revolver ever being recovered inside or outside the house? It was a chaotic and unsecured scene. We know that there were dogs running around. If you see the photographs of the home, it's in a state of serious disrepair. It's also messy. The police, by their own admission, don't do a very thorough search. So it's not out of the realm of help. And we also know someone came in, someone not the police, came back and tied up the dogs who were loose. So it was not a secure crime scene. That gun could have disappeared, could have gotten knocked around. It's not the be-all, end-all of whether the jury could have believed Larry. And, you know, Larry's first trial did end in a hung jury. After four days of deliberation, the jury hung with a holdout juror. But that's not something we take into account on this record, right? It's just relevant for the possibility that the jury, you know, could have – of course the jury was taking its duty seriously, was considering all of the evidence. You know, the state's evidence is not entirely cohesive as far as the story goes. There's lots of inconsistencies and unbelievabilities there, too. The jury easily could have believed, had the press here not made these improper insinuations about Larry's failure to explain himself thoroughly to the arresting officer, they could have easily convicted him of second-degree murder instead. I fear I'm out of time, unless Your Honors have any further questions. Thank you. Good morning again, Your Honors. Mary Hudson with the People of the State of Illinois. First, what happened in the last trial has nothing to do with what happened in this trial and the evidence that was presented in this trial. The defendant did not invoke his right to remain silent at any time. This is not a door violation. The testimony and the evidence was that after the calls of shots were fired, Officer Love responded to a flash message describing what the offender looked like. He saw the defendant running through an intersection. He stopped his car, exited his car. Immediately, the defendant raised his hands, said, I just shot my brother. I want to turn myself in. At no time was there an invocation of silence. And just like Justice Hyman stated, the record does not have any indication that after the defendant was arrested, he was brought to the police station, he was merandized, nothing. It stopped at the defendant admitting that he shot his brother and that he wanted to turn himself in. So it was proper for the people to cross-examine Officer Love on what the defendant did not say. Defendant's theory of the case was self-defense. He is the one who raised the affirmative defense of self-defense. Therefore, the people were entitled to ask Officer Love, did the defendant say he was acting in self-defense when he made that voluntary and spontaneous statement at the time that he was arrested, prior to his arrest. It was proper for the state to also cross-examine the defendant on what the defendant did not say when he voluntarily and spontaneously made the statement. The prosecutor was proper to ask the defendant, did you say anything else? And after a few questions, when the defendant stated he didn't understand the question, the defendant said no. That was proper impeachment, for the state to impeach the defendant on what he didn't say, what he admitted to saying, especially since he raised his theory of self-defense. With regard to the prosecutor's closing argument, the questions that the defendant contends and has a problem with were three isolated statements on one page of a lengthy 23-page rebuttal of closing argument. One of the objections the defense counsel made was overruled and two were sustained. The statements were proper because they were based on the evidence. The trial court, in sustaining the defendant's objections, and we don't know why defense counsel the basis for those objections were, wasn't stated on the record, it's possible that the trial court was exercising due caution because it had already allowed the question, did the defendant tell Officer Lowey that he had a gun? There was no overruling of that objection. But in any event, even if these two statements were air, and even if it was air for the state to question Officer Lowey, and even if it was air for us to cross-examine the defendant on what he didn't say,  this is first-degree murder. This wasn't self-defense. This isn't second-degree murder. This defendant introduced a shotgun and brought it down to the first floor. The victim had just gotten home. He was making his daughter give her favorite meal. Despite what the defendant testified to a trial, there is no evidence that Ronald Pino's went upstairs with a revolver prior to this incident. There's no evidence that he made threats to his brother. This is simply a case where the defendant introduced a shotgun, they tussled over the gun, it fired to the second floor. And at that time, Ronald Pino said, you're going to shoot me? That's what brought his daughter outside. And after the one shot, they entered the apartment, and the 17-year-old daughter thought everything was okay. So she went into her room. Her room didn't have a door. Her room had a curtain, so she could have everything that was going on. And she testified that everything was fine until she heard the defendant and the victim walking to her living room, and she heard the gunshot. And then she ran into her closet, calling her best friend, and she heard another gunshot. And at that point, she heard a fire moaning, saying, you shot me, shot me. And the evidence also showed that the defendant not only followed the victim through the living room, he followed him outside. We have two independent eyewitnesses who saw the defendant on top of the stairs reloading the shotgun. They saw the victim crawling to the middle of the street. They saw the brother shoot the brother again. What about the chaotic crime scene argument? The chaotic crime scene, there's a lot of dispute regarding those dogs. And it was chaotic. That building was since demolished. It was a dilapidated building. There had been a fire there. There was no heat. There was no electricity. There was no evidence that there was a weapon that the victim had. The record shows that police did search. They did search. And what they found, they found expanded shotgun shells. They found that in the living room, and they found one in the truck. They didn't search until the dogs were secured. Exactly. We don't know how long that took. Exactly. So it could have been five seconds. It could have been five minutes. It could have been 25 minutes. We don't know. We do not know. But in the meantime, the victim's wife was around somewhere. No, the victim's wife wasn't there, Your Honor. There's no evidence that she was there other than the defendant's self-serving testimony. She was not on the scene. We have eyewitnesses who said she was never at that location. Marisha certainly didn't testify that her mother was there. And we have witnesses who were on the scene who said they didn't see her. But what's very important about this case is the defendant. If he was acting in self-defense, he would have remained with his brother. His brother was mortally wounded when he fired that third shot. He would have called the police. He would have gone to a neighbor's house. But he didn't. And not only didn't he call the police or stay with his brother, he calmly walked away. And then he disposed of the shotgun and then left the scene. This simply is not a case of self-defense, second-degree murder. And we also believe that the defendant's sentence of 66 years was proper. Unless you have any other questions, we will rest on our brief, and we ask that you affirm the defendant's first-degree murder conviction and his sentence. Thank you. Just a few brief points, Your Honor. First, Your Honors, I'm sorry. Just to be clear, this was argued as not a Doyle violation, but as a violation of the Illinois evidentiary rule prohibiting the elicitation and commentary on a defendant's post-arrest silence. A defendant does not have to expressly invoke his right to remain silent in order to enjoy the protection of that rule. And he is not required to remain on a scene or call the police in order to be convicted of a second-degree murder. But that's fair commentary. When his defense is, I shot my brother in self-defense, the fact that he doesn't remain on the scene to assist the police in investigating that is relevant, isn't it? It's not relevant to his claim of self-defense at all. And I don't have the case in front of me, but there are numerous cases that so hold that that is not a negative inference to be drawn from a defendant's behavior leaving a scene and still claiming self-defense or unreasonable self-defense. If there's nothing else, thank you. Thank you, counsel, for your excellent briefs and excellent arguments. We will take this case under advisement and court is adjourned.